IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JENNIFER FRY, <br><br>                Plaintiff, <br><br>      vs. <br><br> DOANE UNIVERSITY, a non-profit corporation; INTERCHURCH MINISTRIES OF NEBRASKA, a non-profit corporation; and DONALD BELAU, <br><br>                Defendants. | **4:18CV3145** <br><br><br> **MEMORANDUM AND ORDER** |

Plaintiff Jennifer Fry brings federal and state-law claims against Doane University, among others, related to alleged sexual harassment by Defendant Donald Belau, who was the dean of Fry's Master of Arts in Counseling program at Doane. As against Doane, Fry brings discrimination and retaliation claims under Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 *et seq*.,[1] as well as state-law claims of intentional and/or negligent infliction of emotional distress and negligent supervision, training, and retention. (Filing 52, Second Amended Complaint.) Doane moves for summary judgment (Filing 93) on all claims asserted against it.

## I. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial responsibility of

---

[1] Title IX is a federal statute that bans discrimination on the basis of sex in federally funded educational programs.

informing the district court of the basis for its motion, and must identify those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (internal quotation marks and citation omitted). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Id*. (internal quotation marks and citation omitted).

"On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*. (internal quotation marks and citations omitted). But "[t]he nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Id*. (internal quotation marks and citations omitted).

"The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011) (internal quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson*, 643 F.3d at 1042 (internal quotation marks and citation omitted).

## II.  UNDISPUTED MATERIAL FACTS

### A.  Doane's Statement of Undisputed Material Facts

The court finds that the following material facts, as stated in Doane's brief, are fully supported by the evidence cited, and Fry has not properly controverted them. Consequently, they are deemed admitted for purposes of summary judgment. *See* NECivR 56.1(b)(1); Fed. R. Civ. P. 56(e)(2); *Roe v. St. Louis Univ.*, 746 F.3d

2

874, 881 (8th Cir. 2014) ("[i]f no objections have been raised in the manner required by the local rules, a district court will not abuse its discretion by admitting the movant's facts").[2]

---

[2]The court's local rules require the party moving for summary judgment to file a brief containing a "separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." NECivR 56.1(a)(1). This statement of facts "should consist of <u>short</u> numbered paragraphs, each containing pinpoint references to . . . materials that support the material facts . . . ." NECivR 56.1(a)(2) (emphasis in original). If the non-moving party opposes the motion, that party must "include in its [opposing] brief a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1). Such response must "state the number of the paragraph in the movant's statement of material facts that is disputed" and must include "pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies, and, if applicable, must state the number of the paragraph in the movant's statement of material facts that is disputed." *Id*. "Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." NECivR 56.1(b)(1) (emphasis removed).

Here, Fry simply states that she "disagrees" with several paragraphs of Doane's Statement of Undisputed Material Facts without any reference to the materials on which she relies in disputing those facts, in violation of NECivR 56.1(b)(1). (Filing 101 at CM/ECF p. 3.) Instead, Fry sets forth an entirely new Statement of Undisputed Material Facts without specifically responding to Doane's Statement of Undisputed Facts. In this situation, the court is entitled to deem Doane's Statement of Undisputed Facts admitted. *Tramp v. Associated Underwriters, Inc*., 768 F.3d 793, 798-800 (8th Cir. 2014) (plaintiff's inclusion of additional material facts without disputing defendant's statement of facts violated "clear" federal local rules in District of Nebraska, entitling district court to consider the movant's material facts as admitted for purposes of summary judgment motion); *Riggle v. Saver*, No. 8:15-CV-411, 2016 WL 7168030, at *1 n.1 (D. Neb. Dec. 8, 2016) (deeming defendant's statement of undisputed material facts admitted where plaintiff failed to controvert such facts in accordance with NECivR 56.1(b)(1)).

### *The Parties*

1.     From August of 2012 through July of 2015, Plaintiff attended the Master of Arts in Counseling ("MAC") program, offered by Doane.[3]

2.     Defendant Doane University is a non-profit corporation incorporated in the State of Nebraska with its principal office located in Crete, Saline County, Nebraska. Doane is a private liberal arts college established in 1872 in Crete, Nebraska, with campuses in Crete, Lincoln, Grand Island and Omaha.

3.     Defendant IMN [Interchurch Ministries of Nebraska] is a non-profit corporation incorporated in the State of Nebraska with its principal office in Lincoln, Lancaster County, Nebraska.

4.     Defendant Belau is a resident of Lincoln, Lancaster County, Nebraska.

### *Applicable Doane Policies in Years 2014 and 2015*

5.     Doane's mission is to "provide an exceptional liberal arts education in a creative, inclusive, and collaborative community where faculty and staff work closely with undergraduate and graduate students preparing them for lives rooted in intellectual inquiry, ethical values, and a commitment to engage as leaders and responsible citizens in the world."

6.     Doane adopted a Notice of Nondiscrimination, which such notice was in effect during the relevant period in 2014 and 2015. This Notice provides Doane does not discriminate on the basis of sex, among other protected class[es] recognized

---

[3] With the exception of formatting changes, bracketed corrections, and corrections to quoted material, Doane's Statement of Undisputed Material Facts is taken verbatim from its brief to the court. Citations to its supporting evidence have been removed for ease of reading. Such citations may be viewed at Filing 94, CM/ECF pp. 4-35. Plaintiff Jennifer Fry is referred to as "Plaintiff" in Doane's Statement of Facts, whereas the court will refer to her as "Fry" in its analysis.

4

by state or federal law in admission or access to, or treatment, or employment in its programs and activities. This Notice explicitly provides "[s]exual [h]arassment and sexual violence are prohibited forms of sex discrimination."

7.     The Notice identifies Laura Northup (p/k/a Laura Sears), Director of Human Resources, to coordinate Doane's efforts to comply with Title IX and its implementing regulations.

8.     Doane takes these obligations very seriously. Thus, Doane adopted procedures to encourage and require employees and students to report concerns about harassing or offensive conduct and to ensure employees or students that such reports will be addressed thoroughly and promptly.

9.     As such, Doane adopted Nondiscrimination and Harassment Policies, which were in effect in 2014 and 2015. In relevant part, it provides:

> Doane is a place of excitement and learning where all ages, abilities and disabilities, races, creeds, orientations, genders, identities, and ethnic and national origins have the opportunity to develop skills and knowledge toward goals which will make them effective citizens and promote their individual and group well-being.…

10.     As part of the Nondiscrimination and Harassment Policy, Doane maintains, including during the relevant period, the following policies addressing:

- Violence & Unacceptable Behavior;
- Sexual Assault and Rape;
- Anti-Harassment; and
- Bias/Hate Incident.

(herein after collectively referred to as "Nondiscrimination and Harassment Policy").

11. In the Nondiscrimination and Harassment Policy, Doane conspicuously outlines behaviors that Doane will not tolerate.

12. Of significance, in the Anti-Harassment Policy, in relevant part, Doane provides:

> A fundamental policy of the College is that employees and students at the College should be able to work and study at the College in an environment free of discrimination and any form of harassment based on race, color, religion, sex, national origin, disability, age, marital status, [genetic information,] sexual orientation [or any other protected class recognized by state or federal law]. ***To further this fundamental policy, the College prohibits the harassment of any person, student or employee and the prohibition extends to harassment based on*** race, color, religion, ***sex***, national origin, [genetic information,] disability, age, marital status, or sexual orientation. Harassment is counterproductive to the College's goals and will not be tolerated. Such behavior is unacceptable because it is a form of unprofessional behavior threatening to the academic freedom and personal integrity of others.

(Emphasis added).

13. Furthermore, in the Nondiscrimination and Harassment Policy, Doane outlines procedures for reporting and investigating incidents involving sexual assault, harassment, stalking or other behaviors that would violate the applicable policy.

14. The above policies were and are conspicuously outlined in various Student Handbooks.

15. In addition to Student Handbooks, which are readily accessible on Doane's website, during the relevant period in 2014 and 2015 through current, Doane maintains a webpage dedicated to informing the Doane community, including students, about Title IX.

16.    . . . . Therein, Doane provides:

> Title IX of the Education Amendments of 1972 is a federal law
> that prohibits sex discrimination in education.
>
> It states: *No person in the United States shall, on the basis of sex,
> be excluded from participation in, be denied the benefits of, or
> be subjected to discrimination under any education program or
> activity receiving Federal financial assistance.*
> -Title IX of the Education Amendments of 1972, and its
> implementing regulation at 34 C.F.R. Part 106 (Title IX)
>
> ***Sex discrimination includes sexual harassment and sexual
> assault.***

It provides that inquiries regarding Title IX should be referred to Laura Northup.
Most importantly, it provides: "all incidents should be reported immediately," and
provides both on-campus, off-campus and online reporting options.

17.    Doane also encourages reporting by unequivocally stating: "every
report of Sexual and/or Relationship Misconduct will be taken seriously and action
will be taken as appropriate," and providing a list of resources.

18.    During the relevant period in 2014 and 2015 through current, Doane
maintains a Title IX Handout with information on Title IX, including but not limited
to information on how to report a complaint and about available resources.

19.    In addition, the Master of Arts department maintains, including during
the relevant period in 2014 and 2015, a Student Handbook, and therein, the Anti-
Harassment Policy is once again reiterated.

20.    During the relevant period in 2014 and 2015 through current, Doane
also maintains a Faculty Handbook.

7

21.     Therein, Doane reiterates its Notice of Nondiscrimination and Anti-Harassment Policy, as outlined above.

22.     Doane communicates its policies by emailing it to the community [to which] it is applicable and also maintaining a current version of all of its policies on its website.

23.     If Doane implemented a major policy change, then Doane provided training to the community [to which] the policy applies.

24.     Furthermore and most importantly, Doane educates its employees, including faculty, regarding its policies by:

a.     providing orientation to all new employees at the start of their employment with Doane, and discussing Doane's major policies, including the anti-harassment policy

b.     providing training annually to all employees, including faculty, on anti-harassment and Title IX, where amongst other things they are instructed to report if they witness or learn of harassment.

### *Plaintiff's Education at Doane*

25.     On or about June 22, 2012, Plaintiff applied to attend the Master of Arts in Counseling ("MAC") program at Doane.

26.     Plaintiff was admitted into the MAC program, and began attending in August of 2012. Plaintiff was a non-traditional student, and was approximately 30 years old when she began attending Doane.

27.     On August 10, 2012, Doane gave Plaintiff a complete overview of the MAC program.

8

28.     On August 10, 2012, Plaintiff acknowledged:

> …that a complete overview has been provided concerning the Master of Arts in Counseling handbook. All department policies and procedures are available in the handbook at www.doane.edu[,] and any clarification may be obtained from the Dean or Assistant Dean of the program.

29.     During Plaintiff's education period as a graduate student at Doane, Jean Kilnoski served as Plaintiff's advisor.[4]

30.     During Plaintiff's education period as a graduate student at Doane, Don Belau served as the Dean of Master of Arts in Counseling.

31.     Doane adopted [a] Master of Arts in Counseling Student Handbook and Policy Manual ("MAC Handbook") to inform students of policies, procedures, expectations, and guidelines.

32.     The MAC Handbook was applicable to Plaintiff while she attended the MAC program at Doane.

33.     The MAC program is a competency-based practitioner model, which such model places primary emphasis on preparation of students for productive careers as professionals in clinical counseling settings by incorporating both course work and supervised practical experiences.

34.     Prior to beginning practicum, students are required to complete 40 credit hours and [obtain] approval of the Dean.

---

[4] This testimony appears at Filing 94, Ex. G., Fry Dep. at 148:7-11, not 140:6-11, as Doane states in its brief.

35.    Thereafter, the MAC program requires students to complete two 100 clock hours practica, which such practica may be fulfilled over one or two terms.

36.    Students must obtain 40 credit hours of direct mental health service contact with clients during each practicum and must have 1 hour per week of supervision throughout their practicum by an approved on-site supervisor.

37.    Following successful completion of their practicum training, students must complete an internship consisting of eight hundred (800) clock hours.

38.    During their internship, students must obtain 320 hours of direct contact service with clients during their internship, and must have 1 hour per week of supervision throughout their internship by an approved on-site supervisor.

39.    In addition, students must meet in a clinical supervisory group with a faculty member for 1 ½ hours per week.

40.    In accordance with the rule outlined in Statement of Undisputed Facts ¶ 35, from autumn of 2012 through summer of 2014 semesters, Plaintiff was provided the opportunity and successfully completed the required 40 credit hours course work, thereby making her eligible for practicum.

41.    In preparation for performing the practicum and internship, on June 6, 2014, Plaintiff was provided the clinical handbook and participated in the pre-practicum internship meeting.

42.    Plaintiff successfully completed two 100 clock hour practica in autumn 2014 and winter 2014 semesters.

43.    Plaintiff successfully completed internships from autumn of 2014 through summer of 2015[;] Plaintiff completed the required internship consisting of eight hundred (800) clock hours.

10

44.    In July of 2015, Plaintiff graduated from the MAC program, after successfully completing all coursework and passing all of her classes, including the practica and internship, with [a] cumulative GPA of 3.84.

### *Plaintiff's Employment During the Relevant Period, March of 2014 Through April of 2015*

45.    Sometime in March of 2014, IMN published a Job Announcement for the position of Outreach Coordinator, on a part-time basis.

46.    The Job Announcement states that the Outreach Coordinator will be accountable to the Interim Director, and coordinates efforts with the NSSPC Co-Chairs.

47.    The Assigned duties of the Outreach Coordinator were:

1)    Coordinate outreach and implement suicide prevention activities throughout the state.

2)    Serve on the Nebraska State Suicide Prevention Coalition and provide administrative support for meetings and coalition activities.

3)    Provide support to the Lincoln Lancaster Local Outreach to Suicide Survivors Team (LOSS) and help coordinate the annual LOSS walk.

4)    Collaborate with stakeholders including the Interchurch Ministries of Nebraska Board of Directors, Department of Health and Human Services, the Kim Foundation, Bryan Health, the Veterans Administration, the National Guard, the State of Nebraska Office of Veterans Affairs, and other appropriate entities.

5)    Coordinate the distribution and implementation of available seed grants to address suicide prevention, including communication and monitoring of grantee activities.

11

6)      Coordinate grant writing to assist the Nebraska State Suicide Prevention Coalition in attaining established goals.

48.    In March of 2014, Plaintiff applied for this position.

49.    In March of 2014, Plaintiff was hired as the Outreach Coordinator, on a part-time basis, at IMN, and began serving as such on March 15, 2014.

50.    From March of 2014 through March of 2015, Dr. Ken Moore ("Dr. Moore") was Plaintiff's supervisor.

51.    Effective November 1, 2014, according to an employment contract between Plaintiff and IMN—executed by Dr. Moore, on behalf of IMN, and Plaintiff—Plaintiff was hired as Outreach Coordinator on a full-time basis.

52.    The employment contract, in relevant part, provides:

1.      The Outreach Coordinator is to work fulltime on suicide prevention outreach as an employee of IMN. Administrative direction will be by the IMN Program Team and the DHHS Project Management Team in consultation with the Nebraska State Suicide Prevention Coalition. Normally the Outreach Coordinator will meet monthly with each of these teams.

2.      Serve on the Nebraska State Suicide Prevention Coalition and provide administrative support for meetings and coalition activities.

3.      Work with communities to provide education, resources and outreach to military personnel and their families.

4.      Collaborate with stakeholders including the IMN Board of Directors, Department of Health and Human Services, the Kim Foundation, Bryan Health, the Veterans Administration, the National Guard, the State of Nebraska Office of Veterans Affairs, and other appropriate entities.

5.      Coordinate the distribution and implementation of available seed grants to address suicide prevention, including communication and monitoring of grantee activities.

6.      Prepare reports for funders and stakeholders.

7.      Seek ways to sustain community-based activities supporting suicide prevention.

8.      Serve as an advisor to other Nebraska Suicide Outreach Coordinators.

53.      Further, in her role as Outreach Coordinator, Plaintiff worked and collaborated with University of Nebraska Public Policy Center ("Public Policy Center"), which is the entity that administered the grant IMN and NSSPC utilized to perform their work to address suicide prevention.

54.      In 2014 and through March of 2015, Dr. Moore served as the Interim Director of IMN.

55.      In March of 2015, Rev. Jerry Albright ("Rev. Albright") was hired as the Director of IMN, replacing Dr. Moore.

56.      During Plaintiff's employment with IMN, Dr. Moore and Rev. Albright served as Plaintiff's supervisors.

57.      During Plaintiff's employment with IMN, Dr. Belau and Dr. Miers served as Co-Chairs of NSSPC.

58.      During Plaintiff's employment, Dr. Belau and Dr. Miers, as Co-Chairs, provided guidance to Plaintiff.

59.      IMN and NSSPC were not approved internship sites for purposes of the MAC program.

13

60.     Accordingly, although Dr. Belau was identified as Clinical Supervisor to Plaintiff for her role as Outreach Coordinator, Dr. Belau did not provide clinical supervision to Plaintiff because IMN and NSSPC were not approved sites for practicums and internships as it relates to the MAC program.

61.     Dr. Belau defined clinical supervision as discussing "clients' progress on counseling goals, identifying issues, strategies and interventions."

62.     In 2014 and 2015, Plaintiff was never an employee of Doane.

63.     During the relevant period in 2014 and 2015 through current, the Public Policy Center, IMN, NSSPC, or the LOSSTeam were not and are not owned, managed, controlled, affiliated, or directed by Doane University.

### *Plaintiff's Issues With Her Employment at IMN*

64.     During her employment with IMN, Plaintiff, in her own word[s], was "overwhelmed" with work.

65.     For instance, on December 30, 2014, Plaintiff, via email she managed at nebraskalossteam@gmail.com, emailed Dr. Miers:

> . . . .
>
> My apologies for the long update and I have much more happening that we plan to discuss at the next IMN meeting including Kearney forming a coalition. I just was trying to reach out to you or Don to see what is wrong with me! It was probably a mistake but I only took part of Christmas day off and was up most last night trying to gather LOSS data for last year as was requested. . . .

14

I agree that planning everything with a timeline will help with time management and to see what is achievable and how to prioritize requests. I'm just feeling really behind and maybe this is or is not accurate?

How many hours did the PPC contract for support? It would be helpful to have assistance creating materials, agendas, invoices or whatever the job distribution includes.

To which Dr. Miers replied:

Sounds like a lot going on. I agree that you will have to prioritize. We can discuss these projects at the next meeting. Some of these things we probably will need input from entire group but can start with our meeting. . . . I suggest creating a list of the requested projects and let people know you will get back with them if further requests come in.

66.    In November of 2014, Plaintiff communicated with Dr. Ken Moore regarding compensation for services she provided as it relates to Drug Court. Dr. Belau was supportive of Plaintiff's request for payment, and even drafted a proposed response on November 25, 2014 and sent it to Dr. [Miers][5] and Jennifer Fry stating:

I would like you to consider providing Jennifer a letter that can serve as a contract that identifies her as beginning employment as the full-time Suicide Prevention Outreach Coordinator effective October 1, 2014.

Denise tells me that IMN can issue payment effective October.1, 2014. The funds should show up at IMN in early December.

Also, since Jennifer is providing services via the LOSS team coordinator, a continuation of those services which is above and

---

[5] Doane's Statement of Facts claims that the email was sent to Dr. Ken Moore. However, the email was actually addressed to Dave Miers and Jennifer Fry. (Filing 94, Ex. BB.)

beyond the Coordinator position, until it can be filled is suggested. Jennifer would be eligible for payment for those hours she submits for services as well in my opinion.

While she is doing double duty, it would seem reasonable that she keep a record of how her hours of service are being delivered.

I also suggest that the terms of contract such as vacation, sick leave, etc. be clearly spelled out as well.

Dave and I look forward to embarking on this exciting partnership with IMN!

67.     On January 20, 2015, when one of Plaintiff's colleagues emailed the following[:] "Do you think you will actually have LOSS teams in each region by the dates you have projected? Once you put that on paper the Regions will hold you to that…," Plaintiff responded:

Yes! But I can scale it down if you recommend. If I had more help we would have LOSS teams throughout the State right now. I have two coalitions already forming within the last week. My current issue is capacity and it takes me a while to get to some of the paperwork, material designing, etc. when the community is requesting my presence and support in developing local resources. I'm hoping that with collaboration I can continue to reach out to all requests, but I currently have lists of people waiting for time to allow for me to move in and assist.

If you're able to help find solutions to this or recommend I scratch some things as to not be too overwhelmed let me know. With the current issues in Lincoln alone there is quite a bit of work to be done.

Now you've scared me! Maybe I should revise. :) let me know your thoughts.

16

68.     In fact, Plaintiff communicated her desire to resign from her position on at least two occasions.

69.     On March 3, 2015, Plaintiff emailed Dr. Miers and stated:

> I also wanted to mention that I've been trying to get a desk and desktop computer to have a workstation. I was planning to set up an office at IMN when internet is installed since I would be making copies there. [text redacted] called me yesterday to offer a space at the PPC. At the same time, Doane offered to move a desk and computer in my office to utilize. So, I'm not sure what the best location to work from would be?

> Also, I really love this position and everyone is really great to work with. It has become more than I realized and other aspects in my life are suffering to include my family and school work.

> I'm thinking that I may need to resign and try to help as a volunteer as much as possible (if others would be okay with my help). I wanted to see if you had any input or suggestions?

70.     Then on March 21, 2015, Plaintiff emailed Dr. Miers, Dr. Belau, Dr. Moore, Dr. Speck and Sharon Kalcik:

> Several amazing projects are currently moving forward with all of the hard work everyone has put toward the efforts of the grant. I appreciate all of the help that has been provided from everyone. There seems to be some disconnect happening somewhere. Please help to find a solution to why things seem as if they are not coming together. Over the past year, I have worked on average at least 60 hours per week, taken 3 days of vacation, and report to work when sick. There are several things that get to a certain point that I need assistance with in order to continue moving forward. The suggestions given to me are not working and I need solutions.

17

I love this position and would help with this on a volunteer basis. My compensation for all of the hours I put in during 2014 was $12,500 after taxes. My history has shown that I am a self starter and able to manage a lot of various tasks on my own. I currently feel like I am not a value to the project when putting in so much time and effort and not getting the needed support. This is important enough to me that I am willing to resign and put someone in the position that is able to manage everything that is currently happening and provide assistance as needed. Please provide feedback and let me know if there are any other options to make this work.

71.    On April 23, 2015, Plaintiff resigned.

### *Complaints/Reports of Sexual Harassment Against Dr. Belau, and the Investigation by Title IX Coordinator Northup*

72.    On March 27, 2015, Geoffrey Johnson ("Mr. Johnson"), Plaintiff's brother, contacted . . . Title IX Coordinator Northup and reported Plaintiff was being sexually harassed by Dr. Belau.

73.    On March 27, 2015, Northup, who served as Title IX Coordinator, responded:

Thank you for your email and voice message. Doane College take[s] all complaints of harassment seriously….Due to the time of day I've received this message; I will need to follow up on Monday.

74.    Northup is trained to provide a prompt, fair and impartial process from initial investigation to the final decision.

75.    Specifically, when Northup was appointed to serve as the Title IX Coordinator, she received a three-day training on Title IX investigation through D.

Stafford and Associates, and thereafter, she attended "several webinars through variety of organizations."

76.    In accordance with Doane policy and her training, from March 27, 2015 through May 4, 2015, Northup thoroughly investigated this Complaint.

77.    Throughout Northup's investigation, Plaintiff was given multiple opportunities to be heard/respond in a meaningful manner, and provide documents and evidence in support of her allegations against Dr. Belau.

78.    On March 30, 2015, Northup, via email, notified Plaintiff she was contacted by her brother regarding a complaint on Plaintiff's behalf against Dr. Belau, and requested a meeting to discuss Plaintiff's complaint against Dr. Belau.

79.    In the March 30 email, Northup expressly told Plaintiff that Doane takes "all complaints of harassment seriously," and that Doane "will keep the complaint as confidential as possible."

80.    In the March 30 email, Northup expressly told Plaintiff that retaliation is prohibited, and attached Doane's Anti-Harassment Policy.

81.    In addition, on March 30, 2015, Susan Sapp, Counsel for Doane, contacted Mr. Johnson and expressed to Mr. Johnson that Doane intends to take this matter seriously and handle it professionally. Ms. Sapp thanked Mr. Johnson for bringing this situation to Doane's attention, and told him Laura Northup will contact Plaintiff. She also told Mr. Johnson to encourage Plaintiff to tell Laura Northup everything. Ms. Sapp also affirmed that Doane will not retaliate against Plaintiff for making her concerns known, and that all individuals involved with the investigation and the complaint will be advised of the non-retaliation policy.

82.    On March 31, 2015, Northup met with Plaintiff, and Plaintiff was provided an opportunity and did provide a detailed account of her allegations against Dr. Belau and list of witnesses.

83.    On March 31, 2015, Plaintiff alleged the following against Dr. Belau:

a.    On one occasion, Dr. Belau made a comment "we are going to have to put in some long hours; our spouses are going to think we are having an affair."

b.    She felt Dr. Belau sits too close to her.

c.    On one occasion, Dr. Belau was sitting very close to her and their knees were touching.

d.    On another occasion, Dr. Belau stated they were going to "become very close" and touched her leg.

e.    Dr. Belau leaned over and rested his elbow on the back of her chair.

f.    In October of 2014, Dr. Belau commented to Plaintiff to "pull her big girl panties up."

g.    Dr. Belau became verbally abusive towards her and would put down her work saying her work is "unprofessional."

h.    Although she worked the month of October (as Outreach Coordinator), she was not paid; and she felt it was due to Dr. Belau prolonging the process to issue her new contact.

[i].    In December 2014, Dr. Belau told Plaintiff that she would only be able to earn 4 hours of internship credits for her work at NSSPC, which she reported to Jean Kilnoski, Associate Dean, and Kilnoski thought it would be reasonable to earn more than 4 hours, based on the type of work she was doing.

[j].    In February of 2015, when Plaintiff and Dr. Belau attended a presentation together, Dr. Belau commented to her that he would need to "be careful, so no one would get him for sexual harassment," and said "when you go up there to present, you don't need to say anything, people will just look at you."

[k].    Sometime in February of 2015, when Plaintiff told Dr. Belau that she could not handle the amount of work she was doing, Dr. Belau recommended that she drop out of the MAC program, so she could focus more on her work at NSSPC.

[l].    Sometime in mid-March of 2015, when Plaintiff told Dr. Belau that she was nervous about a presentation and asked him jokingly if he wanted

to "switch places" with her, Dr. Belau said that would not be possible, because Dr. Belau was going to get a prostate exam.

[m].   On March 26, 2015, during her clinical supervisory session with Dr. Belau, where there were six other students present, Dr. Belau started to yell at her for something related to work.

[n].   On March 26, 2015, when Plaintiff asked him to sign the papers she need to have signed for the class, he told her she would need to come back later that day or next morning.

[o].   On March 27, 2015, Plaintiff contacted Kilnoski to make sure someone would be in the office when she stopped by to have Dr. Belau sign her papers.

[p].   When Plaintiff had office space in the MAC building for her work at the NSSPC, she would come into her office and could tell he had been in the office because his coat and coffee cup were in there.

[q].   Dr. Belau would barge into her office while she was in a meeting and ask when she was going to meet with him.

84.   During the March 31, 2015 meeting, Plaintiff requested another person supervise her internship, instead of Dr. Belau.

85.   During the meeting, Northup advised Plaintiff she has the option of pursuing either a formal or informal route of processing her Complaint against Dr. Belau, and Plaintiff chose to pursue a formal Complaint.

86.   On April 2, 2015, [Northup] removed Dr. Belau from serving as site supervisor to Plaintiff, and communicated this decision to remove him as site supervisor of Plaintiff to both Plaintiff and Dr. Belau; to which Plaintiff replied "Thank you for providing this information. I will wait for further instruction from Jean when she has found other alternatives for site supervision."

87.   On April 3, 2015, Northup sent Plaintiff a document outlining and summarizing Plaintiff's allegations against Dr. Belau, and asked Plaintiff to let her know if she feels the summary of allegations is an accurate reflection of their discussion on March 31 and provided an opportunity to Plaintiff to make any changes if she so wishes.

21

88.     On April 8, 2015, Plaintiff provided further clarification regarding her allegations against Dr. Belau. Specifically, Plaintiff provided:

> Thank you for putting together the formal complaint. . . . The main adjustments I would point out is that Dr. Belau did make comments about "everyone is going to be looking at you" on a number of occasions, some of them in front of students. I am not sure if he ever used the words "eye candy", but it was worded in various ways on each occasion. The "butt crack" incident my brother referred to in his email was somewhat accurate, but I still did not know how to add it or approach the subject. The incident took place at Doane on a Saturday about 2 months ago, when I dropped the paper puncher and joked that "I hope no one noticed my butt crack" Dr. Belau overheard this and said "hmm, I'm sorry I missed that". I can look through my schedule and give you exact dates of a majority of the incidents and names of people that were present at the time. I also have text messages and emails that support some of the things that occurred. Including text messages from Dr. Belau. The other thing to point out is Dr. Belau limited me to earning a maximum of 4 hours of internship per week in December at any site, not through my work. At that time, he was not allowing any internship hours to be logged related to work efforts. I would need to edit the document I adjusted if you think it is necessary to use the information. I thought it was best to try and get this back to you as quickly as possible. Thanks again for your help.

89.     On April 15, 2015, Plaintiff contacted Northup and claimed she was asked to resign from her position at IMN.

90.     Immediately on April 15, 2015, Northup, going above and beyond her responsibility, contacted the entities which were neither affiliated nor controlled by Doane, IMN and University of Nebraska Public Policy Center, to inquire about Plaintiff's claim that they requested she resign from her position at IMN.

91.     Specifically, Northup contacted Rev. Albright and Dr. Kate Speck ("Dr. Speck"), Senior Research Manager at [the] Public Policy Center, and learned Plaintiff was not asked to resign.

92.     Rev. Albright notified Northup that he valued Plaintiff as an employee and had actually offered Plaintiff a paid leave of absence on April 14, when Plaintiff herself expressed her desire to resign.

93.     Dr. Speck stated she did not tell Plaintiff to resign, and it was Plaintiff who had come to her on April 14 and stated she could not work with Dr. Belau and that Plaintiff expressed she could no longer perform in her position.

94.     In fact, on April 14, 2015 at 8:06 PM, Plaintiff emailed Rev. Albright:

> I just was notified by the HR department at Doane that I should wait to resign until the investigation is complete. I already sent the resignation letter to you and not really sure how we proceed. She also did say that only Kate Speck and Dave Miers are aware of the situation and it sounded like not much detail was given to them.
>
> I am able to tell you that on March 27th another person reached out to Doane with a concern that Dr. Belau was sexually harassing me both at school and while working as outreach coordinator. I was then asked to meet with the HR person at Doane and decided to file a formal complaint. I was told that there would be no retaliation at work or school for filing the complaint. It was my understanding that I did not need to file a complaint with work and that the legal department for Doane had already notified MN.
>
> I let Laura, the HR person at Doane, know that I was told during a meeting today by Kate Speck that it was best to resign because I clearly no longer have any respect for Dr. Belau. I've been trying really hard to continue moving forward at work and school while the investigation is occurring. I'm not clear if this is an act

23

of retaliation or if she is not fully aware of the circumstances and said this out of context. Kate has been super helpful so I'm thinking she most likely meant it in a different way. It really hurt to have someone tell me that I do not respect Dr. Belau when I've been put in an awful situation.

I'm not sure where to go from here. I do think it's best for me to leave the position or take a step back. My guess is someone will be contacting you or I will touch base if I hear more.

95.    Rev. Albright replied to Plaintiff and stated:

I am so sorry to hear this. There should not be any retaliation against you whatsoever. You are the injured party and it is not your fault. This really angers me and I want you to know that I will do whatever I can to stand with you.

Let's just say you are taking a leave for your personal care. There is no shame in that. Let me know if that meets with your approval.

I did message Ken that you were feeling overwhelmed and may need a leave or resign. Let me take the lead with him.

Keep me posted. You will be in my prayers for sure.

96.    Then, on April 14, 2015 at 9:34 PM, Plaintiff emailed Rev. Albright:

Thank you for meeting with me today to discuss options on how to proceed under the current situation. I apologize for resigning without notice and thank you for your cooperation and understanding that this is the best course of action to take with all parties involved. I will submit my expenses to you as well as any materials belonging to IMN or the suicide project as soon as possible. I will also give you instructions on how to proceed with projects that are currently moving forward. Please let me know if there is anything else I can do to help. I will also have any

emails forwarded to the new IMN address that you created if you think it is the best way to proceed.

To which Rev. Albright replied[:]

At 8:07 I received an email that sounded like you were reconsidering your verbal resignation. I responded to that email offering my support and offering a personal LOA to you. So, I need to be clear: are you now submitting your resignation o[r] did you miss my earlier reply? I don't want to pressure you one way or the other. But I need to be clear about what you want to do.

97.    Plaintiff replied:

Sorry for the confusion. This formal resignation was sent around 7:00 and then I sent the email saying maybe we should hold off at 8:07. My internet connection must have delayed the first email and it did not send until 9:34.

I think it's best to sleep on it and contact you tomorrow regarding which decision is best. Thanks for your support.

To which Rev. Albright replied: "I agree. Take whatever time you need."

98.    After confirming with Rev. Albright that Plaintiff was not being asked to resign, Northup contacted Plaintiff and clarified that she was not being asked to resign, and recommended and encouraged Plaintiff not to resign from her position.

99.    On April 23, 2015, Plaintiff called Northup, and reported that she accepted the leave of absence, but that Plaintiff was considering leaving her job and school.

100.   Again, Northup encouraged Plaintiff not to quit school or her job, and provided support resources and offered Doane's counselor, Myron Parsley.

101.   In addition, Northup told Plaintiff, although she was not sure how much influence she could have with IMN, she would reach out to IMN to address Plaintiff's concerns regarding her Outreach Coordinator position at IMN.

102.   During the April 23 phone call, Plaintiff expressed concerns about being in the same building as Dr. Belau for her supervisor meetings with another (new) advisor.

103.   Northup assured Plaintiff she would make arrangements for Plaintiff's supervision meeting to be held privately.

104.   On April 23, 2015, Northup contacted Rev. Albright and—contrary to what Plaintiff told her—learned Plaintiff had actually already resigned from her position, and that IMN was planning on paying Plaintiff the 30 days previously offered as leave of absence to her as severance pay.

105.   This is further confirmed via email Rev. Albright sent to Plaintiff on April 23, 2015 stating:

> After your meeting with Laura she called me. I want you to know that even though you r[e]signed I plan to pay you until May 15th anyway, salary only. We will call it severance pay rather than leave.

> I also want to offer you my services as spiritual director if you so desire. Before your resignation I had to consider you an employee which would be unethical for me to serve as your spiritual director. But since you are no longer an employee I feel there is no conflict of interest between us to serve as your spiritual director.

> [S]o if you think this would help you I am willing to do whatever I can. [R]emember spiritual direction is not counseling in any sense of the word. It is simply one person of faith sitting with another person of faith listening to their personal sto[r]ies of life

26

and faith let me know if I can be of assistance. By the way if you would care for me to provide you with a personal reference I will be most happy to do so.

Plaintiff thanked Rev. Albright, and even referred another person to fill her position.

106.   On April 27, 2015, Northup contacted Plaintiff to let her know that arrangements were made to continue her supervision at another location, per Plaintiff's request.

107.   As part of the investigation, on April 21, 2015, Northup and Julie Schmidt, Vice President of Finance and Administration, met with Dr. Belau to address Plaintiff's Complaints against him, at which time, they provided him a copy of Plaintiff's Complaint and the Anti-Harassment Policy.

108.   During the April 21 meeting, Northup notified Dr. Belau of his right as a respondent. Specifically, Northup communicated to Dr. Belau that he has 7 days to respond to the Complaint, that he has the opportunity to provide list of witnesses and documents he would like Northup to consider during her investigation, and that he has the right to appeal if he does not agree with the decision.

109.   Most importantly, during their meeting with Dr. Belau, Northup and Schmidt:

- Recommended Dr. Belau not to meet with any students without someone else present;

- Instructed Dr. Belau not to reach out to Plaintiff and do his own investigation;

- Instructed Dr. Belau not to retaliate in any way against Plaintiff,

- Expressly warned Dr. Belau that Doane would immediately suspend him if he in any way retaliated against Plaintiff; and

27

•       Instructed Dr. Belau not to have any contact with Plaintiff.

110.    During the meeting, in addition to responding to some of the allegations in Plaintiff's Complaint, he told Schmidt and Northup that he has already worked with Dr. Miers to minimize his communication with Plaintiff, and affirmed to them that he will follow up with Dr. Miers to make sure he does not have any contact with Plaintiff in the future.

111.    On April 27, 2015, Dr. Belau provided a 7-page response to Plaintiff's Complaint, and provided a response to each of the alleged occurrences.

112.    In addition to gathering information and documents from Plaintiff and Dr. Belau, Northup gathered information and documents from the witnesses identified and other individuals Northup discovered to have relevant information in regard[] to the Complaint. Specifically, Northup interviewed: Jean Kilnoski; Dana Miller; Kate Speck; Deb Eberly; Jerry Albright; and Dave Miers.

113.    Throughout her investigation, Northup explored and reviewed the information and documents discovered.

114.    On May 4, 2015, in accordance with the Anti-Harassment Policy procedure for formal complaints, once she received all evidence, finalized interviews and resolved credibility issues, Northup drafted Summary of the Investigation and provided the Summary of Investigation, along with all documents Northup discovered and generated, to John Burney, Vice President for Academic Affairs, Dean of the Faculty.

115.    On May 6, 2015, Northup communicated to Plaintiff that the Summary of Investigation and documents have been provided to Dr. Burney, and he will review the documents and make a final determination, to which Plaintiff replied: "Thank you for letting me know."

116.    On May 12, 2015, Plaintiff emailed Northup and stated:

I wanted to notify you that I entered the Fred Brown Building for the arranged supervision today at 3:15. I noticed [name redacted in exhibit] waiting in the lobby and proceeded to the computer lab to print out documents. [Name redacted in exhibit] came in a few minutes later to notify me that Dr. Belau entered the building and said hi to her. It's my understanding he then looked around the corner where I was working and walked back out of the building. This was very terrifying as it was one of the few times I've been in the building since filing the complaint and the timing was as if he noticed me park and enter the building.

To which Northup replied:

Thank you for letting me know. Don has been instructed to not discuss the complaints with you and we have created the separation between you and he in an effort to keep your interactions at a minimum. I'm glad to hear that he did leave the area when he saw you in the computer lab. Should anything else happen, please let me know.

117.   In the May 12 email, Northup also updated Plaintiff regarding the investigation:

I also wanted to provide you an update on the process. We are still in process of finalizing the results; however you should know that we plan to continue with the separation we have already established between Dr. Belau and you, between now and the final resolution and then thereafter. We will be wrapping up the investigation within the next few weeks and will provide you with a formal response at the beginning of June.

118.   On June 2, 2015, the investigation into the Plaintiff's complaint was completed and final determination was reached.

119.   On June 2, 2015, Northup notified Plaintiff of the decision and appeal process in a letter dated June 2, 2015, which, stated:

This letter is a follow-up to your complaint of sexual harassment reported on March 31, 2015. The investigation of your complaint has been completed and it has been determined that disciplinary action is warranted. The college has taken steps to enact this disciplinary process. Discipline includes, but is not limited to continuing indefinitely with the removal of supervision responsibilities from the accused over your internship. The accused will make no remarks about you to internal or external audiences. The accused will refer any reference checks for you to Associate Dean Kilnoski.

If you would like to appeal this decision, please refer to the process addressed in the handbook provided to you previously. If any additional issues arise or you feel you have experienced retaliatory action as result of making your complaint, please report it to me immediately.

120.   Effective June 8, 2015, Dr. Belau was placed on a Performance Improvement Plan. Specifically, in the Performance Improvement Plan, Dr. Burney communicated to Dr. Belau that, based on the complaints brought to Doane by Plaintiff and other individuals, he has determined that Dr. Belau has violated the values and belief[s] of Doane and the Anti-Harassment policy.

121.   In summary, the Performance Improvement Plan provided:

•   Dr. Belau would not have any supervisory authority over any student internships;
•   Until further notice, Dr. Belau is not to meet one-on-one with any female student at Doane;
•   Until further notice, Dr. Belau is not to have office doors closed when he meets with any students or staff members, even in groups;
•   Dr. Belau is prohibited from engaging in any type of bull[y]ing behavior or coercion of either female or male students as to where they do their internship;
•   Dr. Belau is not to attempt to counsel any students or staff members about matters of a personal [nature];

- Dr. Belau [must] not have and is not allowed to have any type of therapeutic relationship with any student or staff member, nor is he allowed to supervise internships of students, unless and until he gets specific and written permission from Dr. Burney;

- Dr. Belau should not assume the supervision of any new interns, until and unless he gets specific and written permission from Dr. Burney;

- Dr. Belau's job duties[] will be limited to: management of faculty hiring and development; oversight of budget, assessment, and planning; teaching courses as approved by Dr. Burney; preparation to apply to CACREP for accreditation including development of assessment and curriculum revisions; and any other program management or academic or curriculum goals as assigned by Dr. Burney;

- Dr. Belau will be directly supervised by Dr. Burney;

- Dr. Belau must communicate with students and staff in a professional, ethical, credible and accurate manner at all times;

- Dr. Belau must foster a positive, professional relationship with and among students and staff members at Doane; and

- Until supervisory responsibility of internship is restored (if that occurs), Dr. Belau will not attempt to influence any student internships, other people's supervision of internships or for any students.

122. Further, the Performance Improvement Plan, expressly notified [Dr. Belau]:

> Any further behavior of the type outlined above will not be tolerated. To maintain your employment with Doane, you may not violate expectations in the area of professionalism, respect, gender equity, harassment, sexual harassment, abuse of supervisory authority, or conduct otherwise unbecoming of a Doane representative. Progress conferences will specifically address your compliance with this expectation and non-compliance will subject you to consequences including but not limited to suspension and/or termination of your employment.
>
> . . . .

31

4:18-cv-03145-RGK-SMB   Doc # 104   Filed: 10/01/20   Page 32 of 57 - Page ID # 1478

> From this point forward, Doane will have a zero tolerance policy in regard to your violation of any aspect of this directive. You will, therefore, be expected to take all necessary steps to keep every behavior, statement, question, communication, meeting and conversation above reproach and to avoid even the appearance of impropriety. Additionally, you will not bully or coerce any student into undertaking a particular course of study or internship. You will not attempt to direct them to internships or work that meet your wishes or the needs of outside organizations or agencies.

123.   Sometime in June of 2015, Plaintiff contacted Northup via telephone and expressed her feelings of not having strong relationships within the mental health field and how that might impact her future employment opportunities. During this phone call, Plaintiff did not criticize Dr. Belau or allege any improper conduct by Dr. Belau.

124.   After Plaintiff graduated from the MAC program in July of 2015, on September 17, 2015, Plaintiff contacted Northup via telephone to schedule a meeting, but then had to cancel. Plaintiff failed to respond to Northup's request to reschedule the meeting. On September 29, 2016, Northup sent yet another request to set up a meeting, but did not receive a response.

125.   On March 1, 2016, Plaintiff contacted Northup via phone and reported concerns she had regarding her relationships within the mental health community. During this phone call, Plaintiff did not criticize Dr. Belau or allege any improper conduct by Dr. Belau.

### *No Complaint/Reports of Sexual Harassment Against Belau by Plaintiff, Prior to March 27, 2015*

126.   Plaintiff did not report to Doane or its employees and faculty that she was being sexually harassed by Dr. Belau prior to March 27, 2015.

127.   Contrary to her allegation that she reported the sexual harassment to Dr. Miers and Jean Kilnoski that she was being sexually harassed by Dr. Belau, during her deposition, Plaintiff admitted she did not directly tell them she was being sexually harassed, nor did she report behaviors enabling them to reasonably deduce that she was being sexually harassed by Dr. Belau.

128.   Specifically, as it relates to Plaintiff's conversations with Jean Kilnoski regarding Dr. Belau's behaviors, Plaintiff admitted:

> Ex. G, Fry Dep. 96:21-23:
> "Like, I didn't ever tell Jean any details of what was -- like, a lot of details of what was occurring."
>
> Ex. G, Fry Dep. 99:14-25:
> Q. (By Ms. Sapp) I need the specifics, ma'am. I really do.
> A. I -- I don't recall.
> Q. You don't recall any of the specifics that Jean shared with you?
> A. Not during -- not during that time frame [2014].
> Q. Okay. What specifics did you share with Jean during 2014?
> A. It would have been all -- it was vague on both ends. It was just vague, that there really...
> Q. Okay. So no specifics?
> A. No specifics, no.
>
> Ex. G, Fry Dep. 101:12-102:23
> Q. So what else would you look at so that you are able to testify under oath as to what concerns you conveyed to Jean Kilnoski in 2014 about Dr. Belau's conduct?
> A. In 2014 at this point in time I do not have anything besides just vague -- like, I didn't – I know this doesn't matter. I am going to derail or whatever. But I -- I guess I won't say anything.
>      At that -- at that point in time it was I was trying to -- I was trying to mediate the situation. ***I want -- I didn't want to complain to anyone….***
>      I am going to -- going to, like, disrespect them and say, like -- I mean, I guess at that point, like, I -- I was trying to -- the

33

whole entire time I don't -- ***I didn't want to file a complaint. When it -- when Laura brought me in, Laura brought me in to file a complaint because my brother had told her.***

***And I didn't -- I -- I asked her what will happen if I don't cooperate with you.*** And she said she would still have to investigate this because of what my brother had already said because I -- a lot was going on that was just not good.

And I had realized that I was backed in a corner. And that whole entire time I tried to resolve it however I could and without filing a complaint and to just continue going to school and doing my work. That's all I wanted.

Ex. G, Fry Dep. 105:2-8:
Q. I appreciate you sharing that. I am sure you can understand when you tell me you have reported to people you associated with Doane prior to March 27th, 2015, I have to fully understand who you talked to, what you told them about.
A. I was very vague.
Q. All right.

Ex. G, Fry Dep. 129:6-14 [(emphasis added)]
. . . . Like, a majority of it was ***not*** pertaining to sexual harassment or -- or it was not very specific. I pulled Jean in one time when he was limiting me to four credit hours because they said I couldn't get everything done. And Jean came in and laughed and told Dr. Belau, you can't do that to her, it will take her, like, eight years to graduate.

129.   Specifically, as it relates to Plaintiff's conversations with Dr. Miers regarding Dr. Belau's behaviors, Plaintiff allegedly emailed Dr. Miers telling him Dr. Belau told her "to pull her big girl panties up." Plaintiff admitted she deleted, not only the email she supposedly sent him, but also the email she may have received from him.

34

130.    Other than this non-existent email and telling Dr. Miers that Dr. Belau told Plaintiff he had an appointment for [a] prostate exam (which Dr. Miers denies), Plaintiff admitted she was "vague" with Dr. Miers.[6] Plaintiff also admitted:

> Ex. G, Fry Dep., 269:11-[270:5 (emphasis added)]:
> I know in August of -- in like August or September, but probably I think it was August of 2014, it would have been -- it would have started before that, I think, but I -- **I know for sure – I can't recall if I said anything to anyone about the summer months of -- like, or anything that occurred from March to August about the touching or the putting his arm around me**, although it was observed by other people.
>     I did tell Dr. Miers that -- I think I did tell maybe before August once that I felt uncomfortable with him putting him -- his arm around me, but I think that might have been later, but I -- to my recollection, from what I recall my first thing that I mentioned to Dr. Miers was that Dr. Belau had told me to pull up my big girl panties.

131.    In fact, Plaintiff did not give details to Jean Kilnoski and Dr. Miers, and did not report the sexual harassment to them because Plaintiff knew if she told them that she was being sexually harassed by Dr. Belau they would have to report it. Plaintiff did not want that. In Plaintiff's own words:

> A. I just met with her [Jean] maybe on two or three occasions and over that time period, and I told her that what Dr. Belau has been -- like, if I told her details of everything that Dr. Belau had done to me that it -- that she would have to file a complaint and that it would be sexual harassment and that she -- and I think I have even -- that's why -- I think I even -- there -- that -- I remember that too because I think I even tried to talk to Dr. Miers and Jean a couple of times and asked if -- okay, if I tell you -- if I tell you what's going on, like, will you have to report it.
> Q. And what did they say?

---

[6] The "vague" testimony appears at Ex. G, Fry Dep. 142:12-14, not 136:1-15, as Doane states in its brief. (Filing 94 at CM/ECF p. 30.)

A. And they would say, yeah. And so then I just wouldn't say anything or I would be vague about it, like to be able to, like, say enough for them to kind of guide me on how to proceed.

132.   In summary, in Plaintiff's own words[,] "I ha[d] a vague discussion with Dave, with Dr. Miers, and a vague discussion with Jean [Kilnoski]."

133.   During his deposition, Dr. Miers confirmed Plaintiff did not report to him that Dr. Belau was sexually harassing her, and also confirmed that Plaintiff did not give him any details of what was going on. Specifically, Dr. Miers testified:

There was a time where she had reached out to me and gave me a hypothetical situation about something, but it was -- I don't recall the exact details, but it was -- I do recall it was kind of -- these are my words -- kind of bizarre.
    And I was -- didn't really know what -- I couldn't tell, but -- what it was pertaining to. She made it sound like it was not pertaining to her, it was pertaining to somebody else, like another student.
    So in that particular instance I said that -- if I remember -- if I remember correctly I directed her to have that student go to that professor and address that professor directly.
    So it wasn't really about her job. It was about something about an issue with a -- with a professor.

. . . .

I direct -- I directed her to tell that other student to -- that generally in those cases that I would tell the student to go to that professor and talk to that professor one on one.
    I think there was another instance where she had asked me about if she could tell me something. I think it had something to do with confidentiality, and I said that confident- -- you know, that as a -- as a licensed professional confidentiality, you know, has its limits. And so depending on what I am told, you know, that -- you know, that, yeah, I keep things confidential, but depending on what it is that I, you know, am a licensed

professional that has a duty to warn, so then I may need to take something to the next step.

   And at that point, if I -- if I remember correctly, the conversation really didn't go -- go much farther. She didn't really disclose anything to me.

. . . .

I think at the same time that -- or around that same time that she called me about that there were -- I did receive an e-mail that I was included in.

   And it was an e-mail -- e-mail exchange between her and Dr. Belau. And I think a bunch of other students might have been included in the e-mail, if I am not mistaken. And it was kind of an argument about a -- and I don't remember exactly, but it was something about Dr. Belau calling her out in front of the supervision about -- about something, about something that she did or didn't do.

   And she called it -- either she called it unprofessional or he called her unprofessional or I don't remember for sure. I remember when somebody called me five years ago and was asking me about it, I remember bringing it up then and talking about it.

   But it was sh- -- I think it was shortly after that that then she had called me and was bringing up this hypothetical thing. And then I thought is this kind of related to this or what's going on?

   I mean, it was just -- it was kind of weird. I don't know. This -- and that's kind of when things kind of -- when she kind of became -- she kind of stopped talking to me and then . . .

   Q. She became more introverted?

   A. No, I wouldn't say more introverted. She -- she -- no, I don't think she -- she didn't become more introverted. She reached out to me and then another time about a meeting, and she said she didn't want to come into the meeting because Don was there and she said that he's mad at her. And I thought it had something to do with that same situation about the e-mail exchange.

   Q. Did you ask her about why Don was mad at her?

37

> A. I did.
> Q. And what did she. . .
> A. And she wouldn't tell me. And that's what I usually found when I tried to ask her direct questions and say why -- what's going on, why don't you explain to me what's going on, she wouldn't tell me.

134.   In addition, Dr. Miers testified he did not observe any inappropriate behavior of Dr. Belau which Plaintiff alleged occurred.

135.   Furthermore, Kilnoski confirmed Plaintiff did not report to her that Dr. Belau was sexually harassing her.

### *Other Complaints/Reports by Other Members of Doane*

136.   . . . .[7]

137.   On March 19, 2015—mere 9 days prior to Doane receiving Plaintiff's sexual harassment report—during an exit interview, Deb Eberly ("Eberly"), former Administrative Assistant in the MAC Program, when asked "was there anything that you observed that would violate Doane's code of conduct?" she reported to Northup that Dr. Belau treated her like she is not important and dropped things on her desk and kept walking. She also reported that Dr. Belau told her she was [a] very attractive woman numerous times.

138.   Then, on April 17, 2015, after Plaintiff's sexual harassment report, Northup received a phone call from another student, which will be referred to as Student A, in the MAC program, and learned from this student that she was

---

[7] The court has deleted Doane's Undisputed Material Fact No. 136 which stated, "No other member of the Doane community—student, faculty or staff—has ever complained of being sexually harassed by Dr. Belau," because that broad statement is contradicted by Undisputed Material Fact Nos. 137-145.

encouraged to contact Northup by Kilnoski regarding a complaint against Dr. Belau. Northup documented her conversation with this student as follows:

> I walked through the informal and formal processes of the anti-harassment policy. I asked her if she felt this was a harassment complaint or something else and she said "oh yes, it's definitely harassment." She said things had been going on since last September. She said she was worried about retaliation if she made the complaint. I explained that we have a zero tolerance policy against retaliation. She said it would also be extremely uncomfortable because Don is her site supervisor at LPS, if she made the complaint. I said it might be possible to make other arrangements for her site supervision. She said she knew making the complaint was the right thing to do, but she just wasn't sure yet. I talked to about how it was her decision on how to proceed, but encouraged her to do so. I let her know that Doane College does not condone harassment. I told her that it was our responsibility to make the behavior stop, but without the information it is difficult to resolve. She said she wanted to think about it over the weekend and contact me on Monday. I gave her my cell phone number and encouraged her to call over the weekend if she wanted to.

139. On April 17, 2015, Northup followed-up with Student A via email, and communicated:

> I am following up with you to see if you would be willing to discuss your concerns with me regarding Dr. Belau? I am available most of the day today and tomorrow. I would like to encourage you to report any information you have in order for the college to best address any concerns. I will work to keep this as confidential as possible.

140. On April 24, 2015, Student A submitted a complaint against Dr. Belau, which such complaint was investigated and was determined to be founded.

141.   On April 7, 2015, Northup received [an] anonymous voicemail from a former female student, referred to herein as Student B, reporting a complaint against Dr. Belau. Northup could not follow-up on this report as this report was made anonymously.

142.   On April 20, 2015, another student, referred to herein as Student C, emailed Northup and stated:

> I was given your contact information in regards to experiences with Dr. Belau. I am graduating this May. Just wondering how the information given to you would be kept confidential.

To which Northup replied:

> Thank you for contacting me. We will do everything we can to keep your complaint as confidential as possible. Because I don't know the nature of the complaint it is difficult for me to discuss the process that will be followed. If this is a harassment complaint, we do have process that we follow, which allows the person being accused of harassment to respond to the allegations. I would like to state that we have a zero tolerance for harassment and retaliation. I would encourage you to contact me at 402-826-6773 to discuss further.

143.   On April 23, 2015, Northup followed-up with Student C via email and stated:

> I wanted to follow up with you and ask if you would like to schedule a time to discuss your complaint? I am available most of the day today and tomorrow. I would like to encourage you to report any information you have in order for the college to best address any concerns, I will work to keep this as confidential as possible.

144.    On April 23, 2015, Student C contacted Northup via phone, and reported three concerns she had against Dr. Belau, but stated she would not consider them to be harassment.

145.    Doane investigated all of these reported concerns regarding Dr. Belau's behavior, and took the appropriate disciplinary action when it took all of these concerns and complaints against Dr. Belau into consideration and implemented the Performance Improvement Plan.

### Dr. Belau's Separation From His Employment at Doane

146.    On October 1, 2015 and November 17, 2015, Kilnoski and Student A reported two small incidents which indicated Dr. Belau was not taking the no contact order seriously.

147.    Based on these reports and other job performance issues, on December 11, 2015, Doane terminated Dr. Belau from his employment at Doane.

## B.  Fry's Statement of Undisputed Material Facts

After considering Fry's separate Statement of Undisputed Facts (Filing 99 at CM/ECF pp. 1-11) and Doane's response to those proposed facts (which was in accordance with this court's local rules), the court finds the following facts are undisputed for purposes of the pending Motion for Summary Judgment[8]:

1.    Defendant Belau and Fry had a multi-faceted relationship. Dr. Belau was Fry's instructor in Autumn 2014 at Doane University; as NSSPC co-chair with Dr. Miers, Dr. Belau provided Fry "guidance" as it pertained to her part-time and

_____

[8] As with Doane's Statement of Undisputed Material Facts above, citations to the record have been deleted for ease of reading. Those citations may be found at Filing 99, CM/ECF pp. 1-11.

later full-time IMN and NSSPC work; and Dr. Belau was designated as Fry's supervisor for her Norris Internship in March 2015.

2.    Dr. Belau maintains that some of his alleged behavior toward Fry occurred, but was "taken out of context." For example:

> Q . . . . And I think with the first one, we've established the first allegation was that you made a comment along the lines sometimes you would need to work long hours, be out late at night, our spouses are going to think we're having an affair. And I think you have already testified --
> A. Yes.
> Q. -- that was taken out of context; is that correct?
> A. Yes.
>
> . . . .
>
> A. I did stand close to her when I was talking. I would with -- with any student. I would approach any student just to be within earshot of them. I would sit in my chair and turn it around sideways to talk or roll my chair up to the conference table to speak with them. So I treated her no differently than I treated any other student.
>
> . . . .
>
> Q. Okay. And did you ever make a comment to Ms. Fry that you and Ms. Fry were going to become close?
> A. She took that out of context.
>
> . . . .
>
> Q. Did you ever make a comment that it didn't matter what a presenter said because all eyes would be on Ms. Fry?
> A. No. I did not make that specific comment.
> Q. What comment did you make?

> A. I don't recall. I mean, I -- I don't recall that, the
> conversation.
>
> . . . .
>
> Q. I think we can agree that you made the comment about
> your prostate. She just took it out of context. Is that correct?
> A. Yes.

3.     The relationship between Dr. Kate Speck and Fry overlapped between Fry's coursework at Doane and her work performed for the benefit of the Public Policy Center. Specifically:

> a. Dr. Speck, an adjunct professor at Doane, was Fry's instructor for one course, Case Planning and Management, in the spring of 2014.
>
> b. Dr. Speck was also Public Policy Center Senior Research Manager, and the Public Policy Center was the entity that administered the grant which paid Fry's salary.
>
> c. Fry sent an email to multiple recipients, including Dr. Speck, which stated in relevant part, "I love this position and would help with this on a volunteer basis. My compensation for all of the hours I put in during 2014 was $12,500 after taxes. . . . I currently feel like I am not a value to the project when putting in so much time and effort and not getting needed support. . . . Please provide feedback and let me know if there are any other options to make this work."
>
> d. Doane employee Laura Northup reached out to Dr. Speck to inquire about the status of Fry's resignation.

4.     Jean Kilnoski was Fry's academic advisor and the instructor for one of her classes in the MAC program. She was also the Assistant Dean during the relevant

time period. Ms. Kilnoski has a bachelor's degree in human relations and a master's degree in counseling. She has been a licensed mental health practitioner since 2006.

5.      David Miers has a Ph.D. from the University of Nebraska where his focus was suicide prevention. He has significant experience with patients who suffer from PTSD and depression. In fact, he considers himself an expert in the area of depression. He testified that:

> I have given general presentations on depression, on what is depression, what are the signs and symptoms, how do you refer somebody for depression or how do you approach somebody who's depressed and what do you say, how do you -- if somebody says no, I don't want to get help, then what do you do . . . .

He has also done presentations on employee mental health in the workplace.

6.      Fry received the clinical handbook and participated in the pre-practicum internship meeting on June 6, 2014. This was prior to her subsequently accepting a full-time position with Interchurch Ministries of Nebraska (IMN) and Nebraska State Suicide Prevention Coalition effective November 1, 2014.

7.      Fry never received internship or practicum credit for her work as an Outreach Coordinator. Her internship and practicum hours were completed at UNL and Norris Public Schools.

8.      Jean Kilnoski testified as follows about how a site could be approved for internship credit in 2014:

> Q. What changes have there been between 2014 and now to the site approval process?
> A. There is a formal site approval process that involves a site visit and outlining the policies and expectations of the MAC program.
> Q. And how is that different than what it was in 2014 and 2015?

44

A. The policies have remained largely the same. The procedure is more intentional and formal.

Q. What was the procedure before, in 2014 or 2015?

A. The procedure was to communicate policies to a new site, but we didn't formally ask them to acknowledge their ability to meet those.

9.    Jean Kilnoski does not know whether Fry's work at NSSPC or IMN could have counted for internship credit:

A. In order to count experience toward a practicum or internship --

Q. Is it the same policy for both?

A. Yes.

Q. Okay.

A. -- students must collect direct client contact hours.

Q. And how did Doane define direct contact hours in 2014?

A. Those hours must be collected between two parties, both of whom recognize the purpose of the meeting is psychotherapy, and that the service provided cannot be provided with someone than less than a master's in counseling degree.

Q. And how are students told of that direct requirement in a practicum or internship?

A. The policies outlined in the clinical training handbook. It's also specified in the practicum and internship agreements that both students and site supervisors sign.

Q. To your knowledge has Doane -- during your time in the MAC program has Doane ever waived the direct requirement and given internship or practicum credit to a student who was not providing direct psychotherapy?

A. I don't know.

. . . .

Q. And when Dr. Belau was the dean, was he also the director of clinical?

A. Yes.

Q. And that person could have waived the requirement; is that correct?

A. I think you would have to ask Dr. Belau.

10.     Without further explanation, Fry testified by affidavit that she believed she "had a reasonable expectation to have [her] hours with IMN and NSSPC as Outreach Coordinator approved for internship credit."

### Difficulties During Employment with IMN and NSSPC

11.     On April 28, 2015, Fry forwarded an email from December 2014 to Laura Northup where she notified NSSPC co-chair Dave Miers of her workload, to which Dr. Miers responded, "[s]ounds like a lot going on." In Fry's message to Ms. Northup explaining the email to Dr. Miers, she explained:

> I thought it might be helpful to send you this as well. Even though I went almost three months without pay and lost one month of wages, I was still working 12 to 14 hour days including weekends. I sometimes did not sleep to meet expectations. I only took part of Christmas Day and all of New Years Day off. All other holidays I was in Doane working. I felt like it was my fault for not being able to get all of the work I was doing completed and was told by Dr. Belau just to put people on a list and tell them I would get back to them in a few months (seriously). We had funding to hire a part-time person to help but this was not done and I never received pay for extra time (as Dr. Belau mentioned in the previously forwarded email) **I was constantly afraid of being punished at school if not getting all of the work done.** When I took the 3 days off in February, 2015 it was my only break since I was hired in March, 2014. No sick days or vacation and I have 5 little kids.
>
> **It was horrible to be "punished" by Dr. Belau for my first well deserved break.** I also worked until 11:00 p.m. the night before I left and called Dave repeatedly while on the trip because I couldn't get wifi to send out things that were due. My entire family was extremely upset.

(Emphasis added).

46

12.     Fry began attending therapy sessions with Tauni Waddington, MA, LIMHP, LADC, in April 2017.[9]

13.     Jean Kilnoski believed that Defendant Belau's actions with regard to internship and practicum sites was in conflict with Doane policies:

> Q. You told Ms. Northup that in general there's a perception that Don picks on vulnerable students and manipulates them. What led you to make that statement?
> A. I can't recall the specific -- a specific incident that I was referring to; so I don't know how to answer that.
> Q. Well, you made the statement, and I want to know the basis for your statement.
> A. I am sure I could have provided the basis in 2015.
> Q. And sitting here now you don't know what that basis was?
> A. I don't recall the specific basis for that statement.
> Q. It's plural, multiple students. Do you see that?
> A. I do.
> Q. Do you have any reason to dispute that there is a perception that Don picked on multiple students as opposed to just one?
> A. No.
> Q. Do you think that Jennifer was a vulnerable student?
> A. Yes.
> Q. Do you think that Dr. Belau manipulated her?

---

[9] The content of Waddington's report (Filing 100 at CM/ECF p. 27) is inadmissible because she diagnoses Fry's mental condition, identifies the cause of those conditions, classifies Fry's level of functioning before and after the events at issue in this case, and predicts Fry's ability to function in her field in the future based on her psychological symptoms. (Filing 100 at CM/ECF p. 27.) Such opinions are not "lay" opinions under Fed. R. Evid. 701 (see commentary under 2000 Amendments; "lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field" (internal quotation marks omitted)). Rather, Waddington's opinions are expert opinions under Fed. R. Evid. 702 and 703, which must have sufficient foundation and meet a number of criteria in order to be admissible. None of those criteria have been met here.

A. I don't know.

Q. Who do you think Dr. Belau manipulated?

A. I don't know.

Q. How do you think Dr. Belau was manipulating people?

A. I think he encouraged them to accept practicum and internship sites that they may not have been interested in.

Q. You felt that that pressure was in conflict with Doane's policies; is that correct?

A. Yes.

Q. In what way did that conflict with Doane's policies?

A. Students are free to identify sites that they are interested in gaining experience.

Q. Any other policies that that behavior by Dr. Belau conflicted with?

A. I don't know.

14.    Jean Kilnoski acknowledged that Fry came to her with concerns about work, and in March 2015, Fry communicated to Kilnoski that she was considering transferring.

### *Difficulties Following Time of Complaint*

15.    In June 2015 and March 2016, Fry contacted Laura Northup by telephone with "her feelings of not having strong relationships within the mental health field and how that might impact her future employment opportunities."

### *The Department of Education Office of Civil Rights*

16.    On December 6, 2017, the U.S. Department of Education, Office for Civil Rights (OCR) issued a letter on its investigation into these matters.[10]

---

[10] Doane argues that the OCR report is inadmissible as hearsay and as irrelevant. The OCR report is admissible under Fed. R. Evid. 803(8), which contains an exception to the rule against hearsay for "[a] record . . . of a public office if . . . it sets out . . . in a civil case . . . factual findings from a legally authorized investigation;

48

# III.  DISCUSSION

## A.  Title IX Discrimination

Fry first claims that Doane created a hostile, offensive, and abusive environment based on gender when it failed to implement an effective, well-known, and uniformly enforced policy against sexual harassment; to properly investigate Fry's complaints of sexual harassment; to take timely action reasonably calculated to remedy Fry's complaints of sexual harassment; to impose timely discipline upon Doane's employee, Dr. Belau, who engaged in sexual harassment against Fry; and to take reasonable actions to discover and prevent illegal sexual harassment by its employees. (Filing 52 at CM/ECF pp. 7-10.) Doane's inaction, claims Fry, made it impossible for her "to effectively do her job and graduate in a timely manner." (*Id.* at CM/ECF p. 10.)

Title IX, which provides a private right of action, states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The term "discrimination" in this provision includes sexual harassment. *Roe v. St. Louis University*, 746 F.3d 874, 881 (8th Cir. 2014). "An educational institution may be liable under Title IX for a teacher's sexual harassment of a student." *Cox v. Sugg*, 484 F.3d 1062, 1066 (8th Cir. 2007).

---

and . . . the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." *Doe v. Forest Hills Sch. Dist.*, No. 1:13-CV-428, 2015 WL 9906260, at *7 (W.D. Mich. Mar. 31, 2015) (OCR report in Title IX case admissible under Fed. R. Evid. 803(8); OCR's failure to consider certain evidence went to weight, not admissibility of the report). However, I find the OCR report inadmissible as irrelevant to this court's independent analysis of the law as it applies to the particular evidence before it. Fed. R. Evid. 402 (Westlaw 2020) ("Irrelevant evidence is not admissible.").

Where a Title IX claim is based on sexual harassment, the defendant entity can be liable in damages only where it is "'(1) deliberately indifferent (2) to known acts of discrimination (3) which occur under its control.'" *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (quoting *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003)). When a case does "not involve official policy[11] . . . a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 456 (8th Cir. 2009).

Deliberate indifference means that "an official who is advised of a Title IX violation refuses to take action to bring the recipient into compliance," *Gebser*, 524 U.S. at 290 (1998), and such indifference "must either directly cause the abuse to occur or make students vulnerable to such abuse . . . ." *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 782 (8th Cir. 2001). The known acts of discrimination "must be 'so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to the educational opportunities or benefits provided by the school.'" *K.T.*, 865 F.3d at 1057 (quoting *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629, 650 (1999)).

Here, Fry has failed to establish specific facts showing that there is a genuine issue for trial on her Title IX discrimination claim. The undisputed evidence shows that Doane Title IX Coordinator Laura Northup (who Fry concedes is "a person who could have addressed the harassment" (Filing 99 at CM/ECF p. 16)) immediately

---

[11] Here there is undisputed evidence of a strong, specific, published, and readily available Doane policy against sexual harassment of students and Fry's understanding of such policy. (Filings 94-2, 94-3, 94-4, 94-5.) Fry has filed no evidence whatsoever disputing the adequacy of this policy, so this is not a case involving official policy.

began an investigation after she received a complaint from Fry's brother on March 27, 2015, stating that Fry was being sexually harassed by Dr. Belau. On April 2, 2015, and shortly thereafter, Northup removed Dr. Belau from serving as site supervisor to Plaintiff; offered Fry support resources and access to Doane's counselor; changed Fry's site supervision to another location in order to avoid Dr. Belau; informed Belau of the charges against him; and advised Belau not to meet with any students without someone else present, not to have any contact with Fry, not to do his own investigation, and not to retaliate against Fry, warning Belau that Doane would immediately suspend him if he in any way retaliated against Plaintiff. On May 4, 2015, in accordance with the Doane Anti-Harassment Policy procedure for formal complaints, Northup provided her Summary of Investigation, along with all documents Northup discovered and generated, to John Burney, Vice President for Academic Affairs, Dean of the Faculty.

Effective June 8, 2015, Dr. Belau was placed on a Performance Improvement Plan ("PIP") in which Dr. Burney communicated to Dr. Belau that, based on the complaints brought to Doane by Fry and other individuals, he determined that Dr. Belau violated Doane's Anti-Harassment policy. The PIP expressly notified Belau that to maintain his employment at Doane, he could not violate "expectations in the area of . . . sexual harassment . . . ." Based on October and November 2015 reports that indicated Dr. Belau was not taking the no-contact order seriously and on other job-performance issues, Doane terminated Dr. Belau from his employment on December 11, 2015.

Far from being an official who "refuses to take action to bring the recipient into compliance," *Gebser*, 524 U.S. at 290 (1998)—as is required for deliberate indifference in the Title IX context—Northup reacted to the complaint immediately, efficiently, and effectively by implementing several conditions under which Dr. Belau was to behave to neutralize the situation, to minimize contact between Fry and Belau, and to warn Belau that should he violate the conditions, his employment would be in jeopardy. Because Northup—a Doane official who had the authority to address Fry's sexual-harassment complaints against Dr. Belau and to institute

corrective measures on her behalf—adequately responded to Fry's complaints, "a damages remedy will not lie under Title IX." *Gebser*, 524 U.S. at 290; *Plamp*, 565 F.3d at 456. Because there was no deliberate indifference, there is no genuine issue for trial on Fry's Title IX discrimination claim. *Torgerson*, 643 F.3d at 1042 (internal quotation marks and citation omitted).

I am not persuaded by Fry's argument that Northup was deliberately indifferent because she had actual notice of Fry's allegations against Dr. Belau well before she took remedial action in March of 2015. Fry's counsel points to Fry's deposition testimony that Jean Kilnoski told Fry in 2014 that she reported Title IX "concerns" of Fry and "other students" to Northup between October and December 2014. (Filing 94-9 at CM/ECF p. 18, Tr. 66:3-10.) However, Kilnoski herself testified that she did not know whether Fry came to talk with her about Dr. Belau in 2014 (Filing 94-11 at CM/ECF p. 13, Tr. 45:9-16), and she denied talking with Fry in 2014 about any of the specific allegations she made against Dr. Belau (Filing 94-11 at CM/ECF pp. 36-38). Further, during Fry's deposition, she admitted that she did *not* directly tell Kilnoski she was being sexually harassed, nor did she report behaviors enabling Kilnoski to reasonably deduce that she was being sexually harassed by Dr. Belau. (Filing 94-9 at 96:21-23 ("Like, I didn't ever tell Jean any details of what was -- like, a lot of details of what was occurring."); 99:14-25 ("Q. What specifics did you share with Jean during 2014? A. It would have been all -- it was vague on both ends. It was just vague, that there really. . . Q. Okay. So no specifics? A. No specifics, no."); 101:12-102:23 (as to her interactions with Kilnoski in 2014, Fry did "not have anything besides just vague," she "didn't want to complain to anyone," she "didn't want to file a complaint"); 105:2-8 (prior to March 27, 2015, Fry's discussions with Doane's "people" were "very vague"); 129:6-14 (a "majority" of Fry's discussions with Kilnoski prior to 2015 "w[ere] not pertaining to sexual harassment or -- or [they were] not very specific").[12]

---

[12] Dr. Miers's deposition testimony confirms Fry's vague interactions with Doane personnel. (Filing 94-13 at CM/ECF pp. 71-72, Tr. 71:23-72:1 ("when I tried to ask her direct questions and say . . . what's going on, . . . she wouldn't tell me").)

Fry's vague deposition testimony that Jean Kilnoski told Fry in 2014 that she reported Fry's and other students' "concerns" to Northup between October and December 2014 (Filing 94-9 at CM/ECF p. 18, Tr. 66:3-10) must be disregarded because: (1) Fry cannot "generate an issue of fact" via deposition testimony that is "internally inconsistent," *St. Hilaire v. Minco Prod., Inc.*, 288 F. Supp. 2d 999, 1003 (D. Minn. 2003); (2) in the face of much evidence to the contrary, Fry's claim that Kilnoski told her what she told someone else constitutes a "mere scintilla of evidence," which is "insufficient to defeat summary judgment." *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)); and (3) "if a nonmoving party who has the burden of persuasion at trial does not present sufficient evidence as to any element of the cause of action [here, when actual knowledge occurred as is relevant to deliberate indifference], then summary judgment is appropriate." *Id*.

Even if Fry had complained to Kilnoski (or Drs. Speck or Miers) with specifics about Dr. Belau's alleged behavior prior to March 27, 2015, Fry has presented no evidence establishing that Kilnoski, Speck, or Miers were "appropriate" people "with authority to take corrective action to end the discrimination." *Gebser*, 524 U.S. at 290; *see also Plamp*, 565 F.3d at 458 (when there was no evidence that teachers who testified that other students besides plaintiff raised concerns about offending teacher had any control over offending teacher or that such teachers were "vested with special remedial authority regarding sexual-harassment claims generally so as to empower them to stop the harassment," their knowledge of offender's actions was irrelevant; discussing generally what it means to have the authority to take corrective measures or institute remedial action within meaning of Title IX).

Therefore, Doane's Motion for Summary Judgment will be granted on this Title IX claim.

## B.  Title IX Retaliation

Fry next claims that she was retaliated against under Title IX when she was limited to four hours per week of internship credit for her work at NSSCP and IMN when other students received up to 30 hours per week of internship credit. (Filing 52 ¶¶ 63-64.) As a result, she was required to complete an additional internship and practicum at the University of Nebraska-Lincoln and Norris Public Schools to fulfill her internship graduation requirements. Fry also argues that she was retaliated against when she was required to move her office to limit interactions with Dr. Belau, which caused her to stop participating in several organizations relevant to her field of study.[13] Finally, Fry claims there is a "genuine dispute of material fact as to whether Doane was the cause" of Fry "suffer[ing] hardship in securing stable post-graduation employment," making "summary judgment on this claim . . . premature." (Filing 99 at CM/ECF p. 26.)

"[W]hen a funding recipient retaliates against a person *because* [s]he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Jackson v. Birmingham Bd. of Educ*., 544 U.S. 167, 174, 183 (2005) (retaliation "is always—by definition—intentional"). Therefore, to establish a prima facie case of retaliation, Fry must show that (1) she engaged in a protected activity; (2) Doane took a subsequent adverse action against Fry; and (3) the adverse action was causally limited to the protected activity. *Rossley v. Drake Univ*., 336 F. Supp. 3d 959, 964 (S.D. Iowa 2018), *aff'd*, 958 F.3d 679 (8th Cir. 2020) ("[A] Title IX retaliation plaintiff must allege facts showing [s]he was either an employee or was otherwise excluded from participation in, denied the benefits of, or subjected to discrimination under an education program or activity.");

---

[13] Fry refers the court to allegations in the Second Amended Complaint—not evidence—to support her claim that other students received 30 hours per week of internship credit for the same work Fry performed and that Fry stopped participating in several organizations due to the fact that she was required to move her office to minimize interaction with Dr. Belau. (Filing 99 at CM/ECF p. 25.)

*Clausen v. Nat'l Geographic Soc.*, 664 F. Supp. 2d 1038, 1049 (D.N.D. 2009), *aff'd sub nom. Clausen v. Nat'l Geographic Soc'y*, 378 F. App'x 595 (8th Cir. 2010) (unpublished).

In this case, it is unclear what constitutes the retaliatory act that Doane intentionally took *because* of Fry's pursuit of the sexual-harassment complaint against Dr. Belau. It is undisputed that IMN and NSSPC were not approved internship sites for Doane's MAC program. The fact that Fry received only limited credit for those internships, then, cannot be characterized as a showing that Fry "was . . . excluded from participation in, denied the benefits of, or subjected to discrimination under an education program or activity." *Rossley*, 336 F. Supp. 3d at 964 (discussing elements of Title IX retaliation claim). And, as noted above, Fry has failed to direct the court to evidence supporting her claims that other students received 30 hours per week of internship credit for work performed at organizations that were not approved internship sites for the MAC program, like IMN and NSSPC, or that Doane caused Fry to stop participating in several career-related student organizations because she had to move her office to avoid Dr. Belau. "Summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Lacey v. Norac, Inc.*, 932 F.3d 657, 659 (8th Cir. 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

Accordingly, Doane's Motion for Summary Judgment on this claim will be granted.

## C. State Claims

Plaintiff also brings state-law claims against Doane for intentional and/or negligent infliction of emotional distress and negligent supervision, training, and retention. (Filing 52, Second Amended Complaint, at CM/ECF pp. 11-12 (Causes of Action 4 & 5).)

When a district court dismisses federal claims over which it has original jurisdiction, the balance of interests usually "'will point toward declining to exercise jurisdiction over the remaining state law claims.'" *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 792 (8th Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). *See also Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006) ("Congress unambiguously gave district courts discretion in 28 U.S.C. § 1367(c) to dismiss supplemental state law claims when all federal claims have been dismissed . . . ."). Indeed, the Court of Appeals has "'stress[ed] the need to exercise judicial restraint and avoid state law issues wherever possible.'" *Gregoire v. Class*, 236 F.3d 413, 420 (8th Cir. 2000) (quoting *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990)). "'[W]hen state and federal claims are joined and all federal claims are dismissed on a motion for summary judgment, the state claims are ordinarily dismissed without prejudice to avoid needless decisions of state law. . . .'" *Id*. at 419-20 (quoting *ACLU v. City of Florissant*, 186 F.3d 1095, 1098-99 (8th Cir. 1999)).

Because the court is dismissing Fry's federal claims against Doane, the court declines to rule on Doane's Motion for Summary Judgment regarding Fry's state-law claims. Therefore, the court will dismiss Fry's state-law claims against Doane without prejudice to reassertion in the proper forum. *See Labickas v. Arkansas State Univ.*, 78 F.3d 333, 334-35 (8th Cir. 1996) (per curiam) (while district court had discretion to dismiss state-law claims, such claims should have been dismissed without prejudice). Likewise, because the remaining claims asserted against Defendants Belau and IMN are all state-law claims, the court declines to exercise jurisdiction over those claims and will therefore dismiss them without prejudice.

## IV. CONCLUSION

Defendant Doane University's Motion for Summary Judgment (Filing 93) will be granted. Accordingly, Plaintiff Fry's Title IX causes of action against Doane University (Causes of Action 1 & 2) will be dismissed with prejudice. Because the

4:18-cv-03145-RGK-SMB   Doc # 104   Filed: 10/01/20   Page 57 of 57 - Page ID # 1503

court declines to exercise jurisdiction over the state-law claims asserted against Doane University (Causes of Action 4 & 5), such claims will be dismissed without prejudice. Because the remaining claims against Defendants Belau and IMN are all state-law claims[14], the court declines to exercise jurisdiction over those claims and will therefore dismiss them without prejudice.

IT IS ORDERED:

1.     Defendant Doane University's Motion for Summary Judgment (Filing 93) is granted. Plaintiff's Title IX causes of action against Doane University (Causes of Action 1 & 2) asserted in her Second Amended Complaint (Filing 52) are dismissed with prejudice. Because the court declines to exercise jurisdiction over the  state-law claims asserted against Doane University (Causes of Action 4 & 5), such claims are dismissed without prejudice. Because there are no further claims asserted against Defendant Doane University, such Defendant is dismissed from this lawsuit.

2.     Defendants Donald Belau and Interchurch Ministries of Nebraska are dismissed from this action without prejudice because the court declines to exercise jurisdiction over the state-law claims asserted against them.

3.     Judgment shall be entered by separate document.

DATED this 1st day of October, 2020.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge

---

[14] Fry's claims against Defendant Donald Belau are intentional and/or negligent infliction of emotional distress, assault, defamation, and tortious interference with employment relationship. Fry's claims against Defendant Interchurch Ministries of Nebraska are violation of public policy, intentional and/or negligent infliction of emotional distress, and negligent supervision, training, and retention.